IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| FRANK GLENN THOMAS, § | | |
| TDCJ #833999, § | | |
| Plaintiff, § | | |
| § | | |
| v. § | | CIVIL ACTION NO. G-05-0431 |
| § | | |
| DR. DAVID SEAGO, *et al.*, § | | |
| § | | |
| Defendants. § | | |

## **MEMORANDUM AND ORDER**

State inmate Frank Glenn Thomas (TDCJ #833999) has filed a complaint under 42 U.S.C. § 1983, alleging violations of his civil rights. Thomas proceeds *pro se* and *in forma pauperis*. He has filed a memorandum in support of his complaint and, at the Court's request, he has also provided a more definite statement of his claims. (Docs. # 2, # 20). The defendants have filed a motion for summary judgment. (Doc. # 32). Thomas has filed a response to the motion. (Doc. # 37). After reviewing all of the pleadings, the summary judgment record, and the applicable law, the Court grants the defendants' motion and dismisses this case for reasons that follow.[1]

**I.    BACKGROUND**

Thomas is presently in custody of the Texas Department of Criminal Justice - Correctional Institutions Division ("TDCJ") at the Coffield Unit. Thomas sues Dr. David Seago and Dr. Sean Healy, both of whom were formerly employed as "medical residents"

---

[1]    On October 25, 2007, this case was reassigned to United States District Judge Melinda Harmon pursuant to General Order 2007-10. The case is being handled by the undersigned by agreement of the judges.

by the University of Texas Medical Branch ("UTMB").[2]  As discussed more fully below, Thomas complains that these physicians failed to provide adequate care for a broken jaw.

According to the pleadings, Thomas injured himself when he fell from the top bunk in his cell and broke his jaw on February 11, 2005.  Thomas was examined at the unit infirmary, where x-rays revealed at least two fractures.  Thomas was referred for treatment by a specialist at the UTMB Hospital in Galveston.  On February 16, 2005, Thomas had surgery to repair his fractured jaw, which was set, and his mouth was wired shut.  On March 28, 2005, the wires and assorted hardware were removed from Thomas's mouth.  Thomas contends that the wires were removed from his mouth prematurely, before his fractures had fully healed. Thomas claims that, on April 2, 2005, he fell from his bunk and fractured his jaw again.  Thomas was examined at the UTMB Hospital on April 18, 2005, and scheduled for a second surgical procedure.  The surgery was cancelled, and he was returned to his prison unit, because Thomas had sustained a spider bite on his right foot, which became severely infected. When Thomas returned to his prison unit on April 19, 2005, he claims that he was denied narcotic pain medication.  Thomas returned to the UTMB Hospital for surgery

---

[2]   A "resident" of this type is a medical school graduate and licensed physician who is "receiving training in a specialty, usually in a hospital." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1650 (31st ed. 2007).  Dr. Seago and Dr. Healy were completing a medical residency in oral surgery at UTMB in Galveston, which is a teaching hospital that serves the public and also operates a secure acute care facility for TDCJ inmates (referred to in the defendants' pleadings as the "TDCJ Hospital") pursuant to a contract between TDCJ and the UTMB Correctional Managed Care department.  For the sake of clarity and consistency, the Court refers to the hospital in Galveston where Thomas was treated by the defendants as the "UTMB Hospital."

on June 1, 2005. Thomas complains, however, that his jaw was not "re-wired" and that he was denied proper treatment in the form of a metal plate to repair the fracture.

Thomas argues that the defendants denied him adequate medical care with deliberate indifference to a serious medical need in violation of the Eight Amendment to the United States Constitution. Thomas does not seek monetary damages. Instead, Thomas seeks injunctive relief in the form of additional surgery to repair his jaw. The defendants have filed a motion for summary judgment, arguing that Thomas is not entitled to relief. The parties' contentions are discussed further below under the governing standard of review.

## II.     STANDARD OF REVIEW

The defendants have filed a motion for summary judgment, arguing that the plaintiff's claims fail as a matter of law. Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002). In deciding a motion for summary judgment, a reviewing court must determine whether the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The moving party, however, need not negate the elements of the non-movant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). The moving party may meet its burden by pointing out "'the absence of evidence supporting the nonmoving party's case.'" *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 913 (5th Cir. 1992)).

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (internal citation omitted). The non-movant must do more than simply show that there is some "metaphysical doubt" as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted).

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 478 U.S. at 587-88; *see also Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).

However, factual controversies are resolved in favor of the non-movant "only 'when both parties have submitted evidence of contradictory facts.'" *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (quoting *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999)). The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings. *Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002). Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008). Instead, the nonmoving party must present specific facts which show "the existence of a genuine issue concerning every essential component of its case." *American Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (citation and internal quotation marks omitted). In the absence of any proof, a reviewing court will not assume "that the non-moving party could or would prove the necessary facts,' and will grant summary judgment 'in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075) (emphasis in original).

Affidavits cannot preclude summary judgment unless they contain competent and otherwise admissible evidence. *See* FED. R. CIV. P. 56(e); *Love v. Nat'l Medical Enterprises*, 230 F.3d 765, 776 (5th Cir. 2000); *Hunter-Reed v. City of Houston*, 244 F. Supp. 2d 733, 745 (S.D. Tex. 2003). A party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary. *See In re*

*Hinsely*, 201 F.3d 638, 643 (5th Cir. 2000); *see also DIRECTV, Inc. v. Budden*, 420 F.3d 521, 531 (5th Cir. 2005).

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Id.* (internal citations and quotations omitted). The Court acknowledges that the plaintiff proceeds *pro se* in this instance. However, it is well established that "the notice afforded by the Rules of Civil Procedure and the local rules" is considered "sufficient" to advise a *pro se* party of his burden in opposing a summary judgment motion. *Martin v. Harrison County Jail*, 975 F.2d 192, 193 (5th Cir. 1992).

## III.    DISCUSSION

In this case, Thomas complains that two medical residents, identified as Dr. Seago and Dr. Healy, violated his civil rights by failing to provide adequate medical treatment for his broken jaw and by denying him a prescription for narcotic pain medication from April 19, 2005, through April 29, 2005. To prevail under 42 U.S.C. § 1983, Thomas must demonstrate that he was denied adequate medical care in violation of the Eighth Amendment to the United States Constitution, which prohibits cruel and unusual punishment. "Although the Eighth Amendment 'does not, by its precise words, mandate a certain level of medical care for prisoners[,]' the Supreme Court has interpreted it as imposing a duty on prison officials to

6

'ensure that inmates receive adequate . . . medical care.'" *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). "A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when his conduct demonstrates deliberate indifference to a prisoner's serious medical needs, constituting an 'unnecessary and wanton infliction of pain.'" *Easter*, 467 F.3d at 463 (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (quoting *Estelle v. Gamble*, 429 U.S. 97 (1976)).

The Eighth Amendment deliberate-indifference standard has both an objective and subjective component. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To establish deliberate indifference under this standard, the prisoner must show that (1) the defendants were aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn, and (2) that they actually drew an inference that such potential for harm existed. *See id.* at 837; *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999). The Fifth Circuit has stated that the deliberate-indifference standard is an "extremely high" one to meet. *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). "A prison official acts with deliberate indifference 'only if [(A)] he knows that inmates face a substantial risk of serious bodily harm and [(B)] he disregards that risk by failing to take reasonable measures to abate it.'" *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (quoting *Farmer*, 511 U.S. at 847). "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Id.* (citations omitted). A showing of deliberate indifference requires the prisoner to submit evidence that

7

prison officials "'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Id.* (citations omitted).

As outlined above, Thomas complains that he was denied adequate care for his jaw, which was broken after he fell from his bunk on February 11, 2005, and surgically repaired on February 16, 2005. Thomas claims that he fractured his jaw again on April 2, 2005, after falling from his bunk a second time. The defendants, who have provided copies of the relevant medical records and an affidavit from the UTMB faculty physician who supervised Thomas's care, dispute Thomas's claim that he was denied adequate medical treatment or medication for his condition. (Doc. # 32, Exhibits A & B). The medical records and the supervisory physician's affidavit, which document the extensive treatment that Thomas received, are summarized below.

The record reflects that, prior to the jaw injury that Thomas sustained on February 11, 2005, he had a history of serious dental problems. Thomas was thirty-nine years of age when he fractured his jaw in two places on February 11, 2005. The record shows that Thomas had sustained a fractured jaw previously at the age of eighteen, which injury required surgery at Ben Taub Hospital in Houston. As a result of that preexisting injury, Thomas was noted to have a "cross bite" of the left side of his mouth, where the upper and lower teeth were not aligned. Eleven of Thomas's teeth had been extracted prior to 2005,

8

and he had only five teeth remaining on his lower jaw or "mandible."[3]  In addition, Thomas had advanced periodontal disease, which had resulted in bone loss and mobility or movement in his remaining teeth.

After Thomas injured his jaw on February 11, 2005, he was examined at his prison unit, where x-rays revealed "bilateral mandibular fractures."  Thomas was referred to the "Oral and Maxillofacial Surgery"[4] department at the UTMB Hospital in Galveston, Texas, where he was examined by a resident (Dr. Seago) on February 15, 2005.  It was determined that Thomas had a "[r]ight mandibular body fracture extending through tooth # 28," and a "left mandibular angle fracture."  The following day, on February 16, 2005, Thomas had oral surgery to repair his fractured jaw.  Dr. Seago and a supervising faculty surgeon (Dr. Elgene G. Mainous, D.D.S.) performed the procedure, which was described as an "intramaxillary fixation with arch bar application."  During this procedure, various wires were placed inside Thomas's mouth to stabilize the oral cavity and to immobilize the mandibular fractures for healing.

According to the medical records, the procedure was successful and Thomas was discharged to his unit in good condition with instructions to return for follow-up care.

---

[3]  The "mandible" or "mandibula" is the "horseshoe-shaped bone forming the lower jaw." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 1116-17.  Adults normally have up to thirty-two permanent teeth, including wisdom teeth.  *See id.* at 1964.

[4]  While the mandibular bone forms a person's lower jaw, the bone that forms a person's upper jaw is known as the "maxilla."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 1130. The maxilla shapes the face and mouth or oral cavity because "it assists in the formation of the orbit, the nasal cavity, and the palate, and lodges the upper teeth."  *Id.*  Thus, a "maxillofacial" surgeon specializes in procedures which pertain to the oral cavity and the face.  *Id.*

9

Because of the wires in his mouth, Thomas was placed on a full liquid diet and he was given a one-week "medical lay-in" (or pass to excuse him from engaging in work or other activities).  Thomas was also given prescriptions for antibiotics (Amoxicillan), an antibacterial rinse (Peridex), a liquid diet supplement (Ensure), and a narcotic analgesic (Tylenol #3) for pain.[5]

Thomas had a follow-up examination with Dr. Mainous, using the "telemedicine" or "telemed" system run by UTMB, on March 8, 2005.  At that time, Dr. Mainous noted that the arch bars were in place, his fractured mandible was properly immobilized, and his teeth were in "normal centric occlusion."[6]  On March 21, 2005, Thomas was seen by Dr. Mainous and Dr. Seago at the UTMB Hospital for x-rays and evaluation.  The doctors noted that Thomas was "doing well" and scheduled him for a follow-up visit in one week to remove the arch bar apparatus from his mouth.  They also issued Thomas additional prescriptions for Ensure and Tylenol #3.

Thomas had a follow-up examination at the UTMB Hospital on March 28, 2005, where he was seen by Dr. Mainous and Dr. Healy.  During this examination, Dr. Mainous noted that Thomas's occlusion was "stable" and determined that his fractures were healed.

---

[5]  Tylenol (Acetaminophen) with Codeine, otherwise known as Tylenol # 3, is an oral analgesic "for the relief of mild to moderately severe pain." PHYSICIAN'S DESK REFERENCE 2366 (2008th ed.).  It is a Schedule III controlled substance "that can produce drug dependence of the morphine type and, therefore, has the potential for being abused." *Id.*

[6]  "Occlusion" pertains to the "bite" or "relationship of the teeth as components of the masticatory system[.]" DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 1330. "Central" or "centric" occlusion described as "the vertical and horizontal position of the mandible in which the cusps of the mandibular and maxillary teeth interdigitate maximally." *Id.* at 1331.

10

The wires and arch bars were removed from Thomas's mouth at that time. Thomas was advised to follow a "soft diet" and he was given a "slow-eater pass" for one week. He was also given a prescription for Ibuprofen and scheduled for a follow-up visit with a dentist at his prison unit in one or two weeks to be fitted with a "prophylaxis" or splint.

On April 11, 2005, Thomas returned to UTMB, where he was examined by Dr. Mainous and Dr. Healy. Thomas told the doctors that he had been assaulted by another inmate on or about April 2, 2005, and that he was experiencing pain and a "grinding noise" in his left jaw. A dentist who examined Thomas at his assigned prison unit suspected that he had re-fractured his left jaw. An x-ray taken at the prison unit showed a "[n]on-healed fracture" of the left mandibular angle. Dr. Mainous and Dr. Healy scheduled Thomas to return to UTMB for additional treatment. In the mean time, Thomas was instructed to follow a soft diet and he was given a slow-eater pass for two weeks. He was also prescribed Ibuprofen for fourteen days.

Thomas returned to the UTMB Hospital on April 18, 2005, and was admitted for surgery to repair a left mandibular angle fracture. The surgery, which was scheduled for April 20, 2005, was going to be performed by Dr. Healy and Dr. Mainous. The surgery was postponed after Thomas complained of severe foot swelling as the result of a spider bite, which became infected. Thomas also reported having blood in his stool. After consulting with an orthopedic surgeon, who recommended a course of treatment for the infected foot, Thomas was returned to his prison unit for additional care until he could be healthy enough to have surgery.

On June 1, 2005, Dr. Mainous and Dr. Seago performed surgery on Thomas's re-injured jaw. During the surgery, Dr. Mainous observed that there was no mobility at the fracture site, which had healed completely. In his opinion, Thomas's occlusion was adequate, given the limited number of teeth, and did not warrant refracturing the mandible surgically and risking a "malunion, non-union, or infection." Rather than install hardware or wire the jaw shut, therefore, the surgeons performed an "ostectomy and osteoplasty of the left mandible" to remove or smooth over an excessive amount of "bone deposition" that had formed on the affected region.

The procedure was a success and Thomas was discharged to his unit with orders to return for a follow-up examination on June 20, 2005. Thomas was restricted to a soft-food diet for two weeks and given a two-week medical pass. He was also given prescriptions for Amoxicillan, Peridex, and Tylenol #3 for pain.

Thereafter, Thomas was examined at the UTMB Hospital in Galveston on June 20, 2005 and August 22, 2005, where physicians evaluated his continuing complaints of jaw soreness. The treating physicians recommended range-of-motion exercises and warm compresses. In addition, Thomas was given a prescription for Flexeril to ease his discomfort.

Thomas returned to the UTMB Hospital again on November 21, 2005, where he complained of pain when he opened his mouth to yawn. Dr. Mainous examined Thomas and scheduled a CT scan. During a follow-up examination at the UTMB Hospital on January 2, 2006, records show that Thomas could open his mouth 30-35 mm, but that his

temporomandibular joint ("TMJ") was tender.[7] CT x-rays were taken on January 30, 2006, revealing "[s]mall cortical irregularities" on his mandible, which were consistent with healed fractures. There was also a "[s]mall loose body" noted in Thomas's left TMJ.

After receiving the results of the CT scan, Dr. Mainous next examined Thomas on February 6, 2006, where his chief complaint was left jaw pain with "clicking" sounds in his TMJ. In his affidavit, Dr. Mainous explains that this is not uncommon in cases where, as with Thomas, a patient has missing posterior molar teeth. Dr. Mainous recommended that the unit dentist prepare an "interocclusal splint or plastic removable plate" for Thomas. According to Dr. Mainous, recent clinical notes from April 2, 2008, show that Thomas is doing well.

Thomas does not dispute that he received extensive care for his fractured jaw in 2005. He complains, nevertheless, that he was denied adequate medical care on March 28, 2005, when his arch bars were removed too soon. Thomas complains further that, after his second surgical procedure was cancelled on April 19, 2005, Dr. Seago failed to renew his prescription for Tylenol #3 and he was unable to get a new prescription from his unit physician until April 29, 2005. Thomas also complains that, on June 1, 2005, Dr. Seago performed an ostectomy instead of inserting a plate and wiring his jaw shut to repair the fracture.

---

[7]  The temporomandibular joint or TMJ connects the temporal bone and the mandible. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 987, 1904.

13

In response to these specific claims, the defendants point to the affidavit provided by Dr. Mainous, the admitting physician who was present throughout Thomas's case and participated in both surgical procedures that were performed at the UTMB Hospital on February 16, 2005, and on June 1, 2005. (Doc. # 32, Exhibit B). Dr. Mainous opines that Thomas received the "best of care," as well as sufficient pain medication, which was provided to him by trained personnel in an appropriate manner:

> The treatment that Frank Thomas received at [UTMB] Hospital, Galveston more than meets the normal standards of care. Mr. Thomas has sustained three fractured mandibles that we know of during his adult life. He has lost all but five remaining teeth in his mandible and these remaining teeth have periodontal disease with loss of alveolar bone and mobility. To make sure Mr. Thomas was properly reduced into a normal centric occlusion, impressions were taken of the mandible and maxilla and an interocclusal plastics splint was made to key the teeth into when the mandible was immobilized. These models are still available for inspection. X-rays have been taken and are still retained. X-rays taken at his unit were enlarged posterior anterior views and a Townes view in which the x-ray beam passes parallel through the fracture site.[8] The views always exaggerate the gap between the fractured fragments. Clinical fractured healing is different than radiographic healing. A fractured bone will heal in approximately five to six weeks, but it takes 14-16 months for a fracture to mineralize and not be able to be visualized on x-ray examination.
>
> With Mr. Thomas's second fracture, he stated he fell into a wall in transit to his unit and refractured his mandible. Both myself and Dr. Healy recorded Mr. Thomas's history as having been in an altercation. Mr. Thomas's various recitations about the nature and cause of his injury have been inconsistent and unreliable.

---

[8] A "posterior anterior" x-ray or "posteroanterior" view is "a radiographic projection in which the central ray goes from the back to the front of the body, with the film at the front." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 1546. A "Townes" x-ray is "a radiographic projection of the cervical or thoracic spine with the patient lying supine on a table, the neck hyperextended, the upper limb nearer the camera parallel to the body, and that nearer the film placed above the head." *Id.* at 1547.

> Mr. Thomas complains that we should have placed metal plates on his jaw . . . This is not, in fact, the acceptable standard of care. Any orthopedic surgeon will tell you that if a fracture can be treated without opening the fracture and placing metal plates (foreign body), that [this] is the proper way a fracture should be treated. Approximately 50-60% of bone fractures treated with plates become infected and the plates must then be removed. At [UTMB] Hospital, Galveston, Oral and Maxillofacial Surgery takes out more infected plates than they insert to treat fractures. It has been my experience after treating mandibular fractures for the past 19 years at UTMB-Galveston, prisoners always want the surgeon to put metal plates in their jaws, generally for reasons of secondary gain.
>
> As for Mr. Thomas not receiving adequate pain medication, he was always prescribed narcotic analgesics post-surgery. His medication on his prison unit and infirmary is managed by other personnel with our recommendation for the first 7 days. It is not uncommon for patients to be discharged with prescriptions for narcotic pain medication but for those orders to be modified by a unit provider (medical doctor, physician's assistant, or nurse practitioner) due to the fact that narcotic medication cannot be issued to the prisoner to keep on his person.
>
> It is my opinion that Mr. Thomas received the best of care at [UTMB] Hospital, Galveston, and was treated by an Oral and Maxillofacial surgeon certified by the American Board of Oral and Maxillofacial Surgery. I believe that any other reasonably well-trained medical provider under the same or similar circumstances, and knowing what these providers knew at the time, would believe that the care provided to Plaintiff was timely, appropriate, and consistent with the Constitution of the United States and the laws of the State of Texas.

(Doc. # 32, Exhibit B, Affidavit of Dr. Mainous) (footnote added). The medical records support the defendants' contention, and Dr. Mainous's opinion, that Thomas was treated appropriately for his concerns.

Thomas has no countervailing proof. He has failed to show that was denied adequate care for his broken jaw or that the defendants were responsible for failing to provide sufficient pain medication at any time. To the extent that Thomas disagrees with the level

15

of care that he received, the Fifth Circuit has held repeatedly that mere disagreement with medical treatment does not state a claim for deliberate indifference to serious medical needs under the Eighth Amendment. *See Stewart v. Murphy*, 174 F.3d 530, 535 (5th Cir. 1999); *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997); *Spears v. McCotter*, 766 F.2d 179, 181 (5th Cir. 1985); *Young v. Gray*, 560 F.2d 201, 201 (5th Cir. 1977). Even if a lapse in professional judgment occurred, any such failure amounts to mere negligence or malpractice, and not a constitutional violation. *See Harris v. Hegman*, 198 F.3d 153, 159 (5th Cir. 1999) (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)). It is well established that allegations of unsuccessful medical treatment, acts of negligence, or medical malpractice "do not constitute deliberate indifference[.]" *Gobert*, 463 F.3d at 347 (citations omitted). Thus, allegations of negligence and medical malpractice will not suffice to demonstrate an Eighth Amendment claim. *See Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001); *see also Stewart*, 174 F.3d at 534 ("[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not.").

Viewing all of the evidence in the light most favorable to the plaintiff, as non-movant, Thomas does not show that he was refused care or adequate medication and he does not otherwise demonstrate that the defendants intentionally treated him incorrectly with wanton disregard for his medical condition. *See Domino,* 239 F.3d at 756. Thomas's allegations concerning the level of care that he received are not sufficient to raise a genuine issue of material fact on whether he was treated with deliberate indifference and they do not articulate a violation of the Eighth Amendment. Because Thomas fails to establish that relief is

available under 42 U.S.C. § 1983, the defendants are entitled to summary judgment in their favor.

### IV.   CONCLUSION AND ORDER

Based on the foregoing, the Court **ORDERS** as follows:

1. The defendants' motion for summary judgment (Doc. # 32) is **GRANTED**.

2. The plaintiff's civil rights complaint is **DISMISSED** with prejudice.

The Clerk is directed to provide a copy of this order to the parties.

SIGNED on January <u>30th</u>, 2009.

_____
Nancy F. Atlas
United States District Judge